UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 JUN 10 P 12: 23

U.S. DISTRICT COURT
DISTRICT OF MASS.

ROY OWENS,

          Plaintiff,

v.

WILLIAM FRANCIS GALVIN, Secretary of the
Commonwealth of Massachusetts, et al.

          Defendants.

CIVIL ACTION
NO. 04-11149-DPW

**DEFENDANT SECRETARY OF THE COMMONWEALTH'S OPPOSITION
TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND
MEMORANDUM IN SUPPORT OF SECRETARY'S MOTION TO DISMISS**

As best as can be gleaned from the Complaint, plaintiff Roy Owens seeks declaratory and injunctive relief against the Secretary of the Commonwealth (and local election officials) in an effort to have his name placed on the November 2, 2004 ballot as an "unenrolled" candidate for the office of State Representative for the 5th Suffolk District. Pursuant to Massachusetts election laws, Owens is ineligible to have his name placed on the ballot as an unenrolled candidate for two independent reasons. First, by selecting a Democratic Party ballot in the presidential primary election held on March 2, 2004, Owens became enrolled in the Democratic Party. Massachusetts law disqualifies any person from being certified as an unenrolled candidate if he or she was enrolled in a political party at any time within ninety days preceding the filing deadline for the office he or she seeks. This requirement is referred to as the "disaffiliation provision." Second, Owens failed to submit the required number of certified signatures in the manner specified by Massachusetts law to qualify for listing on the ballot as candidate for the office of State Representative. This requirement is referred to as the "signature provision."

Contrary to Owens' argument in support of his motion for a preliminary injunction, there is nothing unconstitutional in the Secretary and other election officials' enforcement of the plain

language of the Commonwealth's election laws. The Supreme Court in <u>Storer v. Brown</u>, 415 U.S. 724, 728 (1973), upheld a similar (indeed, a more restrictive) disaffiliation provision that denied ballot position to independent candidates who had voted in the immediately preceding primary elections or had registered party affiliation at any time during the <u>year</u> prior to those elections. Drawing on the <u>Storer</u> decision, the Supreme Judicial Court in <u>Metros v. Secretary of the Commonwealth</u>, 484 N.E.2d 1015, 396 Mass. 156 (1985), rejected a nearly identical challenge to the constitutionality of the same disaffiliation provision at issue here. And, only last month, Judge Stearns, looking to both <u>Storer</u> and <u>Metros</u>, rejected another constitutional challenge to the Secretary's enforcement of the disaffiliation provision on facts substantively indistinguishable from those presented here. <u>McClure v. Galvin</u>, No. 04-10826-RGS, slip op. at 3-4 (D. Mass. May 17, 2004) (copy attached to the accompanying motion).

Owens' argument fares no better with regard to the Secretary's enforcement of the signature provision, although this argument need be addressed <u>only</u> if this Court declines to follow the weight of precedent supporting the Secretary's enforcement of the disaffiliation provision. The Supreme Court has long recognized that states have an "undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot," <u>Munro v. Socialist Workers Party</u>, 479 U.S. 189, 194 (1986), and to enforce a broad range of procedural requirements, including regulations governing the number of signatures and form of nomination papers, aimed at ensuring that elections are conducted in a fair and honest manner. <u>Timmons v. Twin Cities Area New Party</u>, 520 U.S. 351, 358-59 (1997). The generally applicable and facially neutral signature and nomination form requirements at issue here easily pass constitutional muster.

For either one of these reasons, Owens fails to demonstrate a likelihood of success on the merits of his constitutionally-based claims, and his motion for a preliminary injunction should

accordingly be denied.[1] Furthermore, to the extent Owens' complaint seeks relief (monetary or otherwise) on any exclusively state law claims (i.e., the Secretary's alleged failure to adhere to the requirements of Massachusetts election laws or any alleged tort claims), he likewise fails to demonstrate a likelihood of success on the merits because the Secretary is immune from suit under the Eleventh Amendment.

## I.   STATEMENT OF FACTS

The term "unenrolled candidate" refers generally to a "candidate for election to any office who is nominated otherwise than by a political party" through the traditional primary system. See G.L. c. 53, § 6. To be qualified for listing on the ballot, a person seeking to run as an unenrolled candidate must satisfy certain requirements imposed by Massachusetts election laws. As relevant here, an unenrolled candidate for state district office first must obtain a Voter Registration Certificate from the local election officials and collect, in the manner specified by law, the required minimum number of signatures from certified registered voters living within the district for which he or she seeks to be elected. G.L. c. 53, §§ 6, 7 and 8. A candidate who fails to meet these (and other) requirements is ineligible from having his or her name listed on the ballot, but may nevertheless pursue a "write in" campaign for the office he or she seeks. G.L. c. 53, § 34; G.L. c. 54, § 42; Metros, 484 N.E.2d at 1019, 396 Mass. at 161.

### A.   The Disaffiliation Provision

The requirement for obtaining a Voter Registration Certificate is imposed by G.L. c. 53, § 6, which provides that the name of an unenrolled candidate "shall not be printed on the ballot at a

---

[1] In addition, since the controlling precedent discussed herein establishes that Owens' complaint fails to state a claim upon which relief may be granted, the Secretary's accompanying motion to dismiss should likewise be allowed. See Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988) (to survive a motion to dismiss for failure to state a claim, a plaintiff must set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory").

state election . . . unless a certificate from the registrars of voters of the city or town wherein such person is a registered voter, certifying that he is not enrolled as member of any political party, is filed with the state secretary or city or town clerk on or before the last day provided in section ten for filing nomination papers." Section 6 goes on to state that "[n]o such certificate shall be issued to any such candidate <u>who shall have been an enrolled member of any political party</u> during the time [1] prior to the last day for filing nomination papers as provided in section ten, and [2] on or after the day by which a primary candidate is required by section forty-eight to establish enrollment in a political party." G.L. c. 53, § 6 (bracketed numbers and emphasis added). Section 6 thus creates a period during which a candidate who wishes to run as unenrolled must not have been enrolled in any political party; clause [1] specifies the end date of that period, by reference to G.L. c. 53, § 10, and clause [2] specifies the beginning date of that period, by reference to G.L. c. 53, § 48. Comparable enrollment requirements are imposed on political party candidates. See G.L. c. 53, § 48 (persons seeking to have their name placed on the ballot as candidate for a political party's nomination must obtain an enrollment certificate, certifying that they have been an enrolled member of the political party whose nomination they seek throughout the ninety days prior to the applicable filing deadline").

The current deadline for filing nomination papers with the Secretary for candidates for the office of State Representative expired at 5:00 p.m. on Tuesday, May 25, 2004.[2] See G.L. c. 53, § 10 (nomination papers for state representative "shall be filed with the state secretary on or before the last Tuesday in May of the year in which a state election is to be held").

Section 48 of G.L. c. 53 requires that a person running as a party candidate obtain an enrollment certificate and further states that no certificate can be issued unless the person has been enrolled as a member of the political party whose nomination he seeks throughout the

---

[2] Since the election is not scheduled to take place until November 2004, the Secretary does not contend that this case is moot.

4

ninety days prior to the last day for filing nomination papers with the Secretary. G.L. c. 53, § 48. Ninety days prior to May 25, 2004 was February 24, 2004.

Thus, based on G.L. c. 53, §§ 6, 10 and 48, a candidate wishing to be listed on the November ballot as unenrolled must not have been enrolled in any political party <u>at any time</u> between February 24, 2004 and May 25, 2004.

Voting in a political party's presidential primary enrolls a voter in that party. Section 37 of G.L. c. 53 states in relevant part (with emphasis added) as follows:

> . . . If the party enrollment of the voter is not shown on the voting list the ballot clerk shall ask such voter in which political party's primary he desires to vote, and the ballot clerk, upon reply, shall distinctly announce the name of such political party, and shall record the voter's selection upon the voting list. The ballot clerk shall then give the voter the ballot of the political party so requested. If the voter was unenrolled prior to the selection of a party ballot he shall continue to be unenrolled, and shall be recorded as unenrolled in the current annual register of voters; <u>provided, however, that in a presidential primary, the voter shall become enrolled in and shall remain a member of the political party whose ballot he received</u> until he files a certificate, signed under the pains and penalties of perjury, with the board of registrars of voters, requesting to have his enrollment changed to another party or political designation or cancelled or by appearing in person before a member of said board and requesting, in writing, that such enrollment be changed or cancelled. . . .

### B.   **The Signature Provision**

To be listed on the ballot, an unenrolled candidate for the office of State Representative also must submit to the Secretary on or before the applicable filing deadline nomination papers, containing the signatures of 150 registered voters.[3] G.L. c. 53, § 6. Section 8 of G.L. c. 53 specifies that "[a]ll . . . nomination papers shall, in addition to the name of the candidates, specify as to each, (1) his residence, with street and number, if any, (2) the office for which he is

---

[3] Prior to being filed with the Secretary, the local registrar of voters or election commissioners must certify that the signatures contained on the nominating papers reflect the names of voters registered in the district for which the nomination is sought. G.L. c. 53, § 7; Teixeira v. Board of Election Comm'rs, 287 N.E.2d 606, 607, 362 Mass. 526, 528 (1972) ("Certification by the board is a prerequisite to the filing of nomination papers with the Secretary. . .").

nominated, and (3) . . . . the political designation, if any, which he represents, expressed in not more than three words." G.L. c. 53, § 8. Section 8 further states that the foregoing information "<u>shall</u> be <u>specified</u> on the nomination paper <u>before</u> any signature of a purported registered voter is obtained and the <u>circulation of nomination papers without such information is prohibited</u>." <u>Id.</u> (emphasis added). A substantively identical requirement is imposed on candidates seeking a political party's nomination through the state primary process. See G.L. c. 53, § 45.

The cover page of the official nominating form provided by the Secretary to all prospective candidates (and used by Owens here) states – in bold type under the heading "INSTRUCTIONS TO ALL CANDIDATES" – as follows:

> All candidate information (gray areas) must be filed in on every nomination paper prior to circulation. Residence must include the candidate's street name and number, if any, and the city or town or some clearly identifiable reference to the city or town. <u>Certified signatures on nomination papers without the required information cannot be counted</u>.

See Compl. at Exhibits 1-11 (emphasis added). One of the "gray areas" allows the candidate to "express" in not mere than three words his or her "political designation." <u>Id.</u> The second gray area includes a line for residence and, consistent with the instructions, provides space for listing "street & number," "city or town," and "zip code." <u>Id.</u>

### C. Owens' Factual Allegations

Owens contends that he "took out" nomination papers as an unenrolled candidate for the office of State Representative for the 5th Suffolk District. (Compl. at ¶ 9). He further alleges that he "collected 498 signatures from neighbors and friends" and submitted those signatures to local election officials for certification.[4] <u>Id.</u> The local election officials, however, refused to issue Owens a Voter Registration Certificate as an unenrolled

---

[4] The local election officials certified only 214 of the signatures that Owens collected. See Affidavit of Michelle K. Tassinari ("Tassinari Aff.") at ¶ 5.

6

voter because Owens voted in the Democratic Party's March 2, 2004 presidential primary and, thereby, became enrolled in that party within the mandatory 90-day disaffiliation period. See id. at ¶ 9; G.L. c. 53, §§ 6, 48. Absent a Voter Registration Certificate, the Secretary determined that Owens is disqualified from having his name placed on the November ballot as an unenrolled candidate. G.L. c. 53, § 6; Compl. at ¶¶ 9, 13. Owens contends that the Secretary's application of the disaffiliation provision to him is "clearly discrimination" (and, it appears, an alleged violation of his constitutional right to equal protection) because the same requirement allegedly is not imposed on political party candidates. See Compl. at ¶ 13.

Owens further alleges that the Secretary improperly rejected 11 nomination sheets (and the 96 certified voter signatures contained thereon) that Owens submitted in support of his nomination because the forms either failed to identify his (a) city of residence or (b) political designation.[5] See id. at 10-12 and Exhibits 1-11. Excluding these noncompliant nomination sheets (and the certified signatures contained thereon) from consideration, the Secretary determined that Owens fell 32 certified signatures short of the statutory minimum number of certified signatures required for listing on the ballot. See id. at ¶¶ 10-12; Tassinari Aff. at ¶ 10. Although Owens concedes that seven of the sheets do not contain his city or town of residence, he alleges that the Secretary nevertheless should have accepted those forms (and the 75 certified signatures contained thereon) because they referenced a zip code (02119) that was sufficient to identify Boston as his city of residence. Id. at ¶ 11 and Exhibits 5-11. Owens likewise concedes that four of the sheets (containing 21 certified signatures) do not include any political designation, see id. at ¶ 12 and Exhibits 1-4, even though the remainder of the sheets that Owens submitted identified his political designation as "Independent" or "Ind." Id. at Exhibits 5-11.

---

[5]One of the sheets (containing 4 certified signatures) lacked both a designation of the city and political designation. See Compl. at Exhibit 4; Tassinari Aff. at ¶ 8.

7

Owens contends that the Secretary should have overlooked this omission too because, he argues, the Candidate's Guide to the 2004 State Election (issued by the Secretary) states that "[i]f you place no political designation on your papers, the designation 'unenrolled' will appear on the ballot." Id. at ¶ 12 and Exhibit 12.

## II.   ARGUMENT

### A.   Preliminary Injunction Standard

Owens, as the party seeking a preliminary injunction, bears the burden of establishing (1) a likelihood of success on the merits; (2) a potential for irreparable injury; (3) that the balance of equities favors him; and (4) that the public interest would not be adversely affected by an injunction. Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991). The "sine qua non" of this familiar four-part test is whether Owens has carried his burden of establishing a likelihood of success on the merits. Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993). Since this critical factor is missing here, Owens' motion for a preliminary injunction should be denied. See id. (if plaintiff fails to demonstrate likelihood of success, court need not address three remaining factors).

### B.   Owens Fails To Establish A Likelihood Of Success On The Merits Of His Constitutional Claims

The Supreme Court has long recognized that "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election– and campaign-related disorder." Timmons, 520 U.S. at 358. This acknowledgement reflects the practical consideration that "'there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process.'" Libertarian Party v. Diamond, 992 F.2d 365, 370 (1st Cir. 1993) (quoting Storer, 415 U.S. at 730). States must, of course, exercise this broad regulatory authority within the limits imposed

8

by the First and Fourteenth Amendments. Williams v. Rhodes, 393 U.S. 23, 29 (1968); Cool Moose Party v. Rhode Island, 183 F.3d 80, 82 n.2 (1st Cir. 1999).

There is no "litmus-paper test" to resolve constitutional challenges to a state's elections laws, including, as relevant here, restrictions imposed on a prospective candidate's ballot access. Storer, 415 U.S. at 730. Instead, the Supreme Court has developed a sliding scale approach to resolving constitutional challenges to a state's election laws, depending on the "character and magnitude" of the interests at stake. Timmons, 520 U.S. at 358. Only state laws that impose "severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling interest." Id. "Lesser burdens . . . trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" Id. (quoting Burdick v. Takushi, 504 U.S. 428, 434 (1992)). Application of this flexible standard here is eased because the Supreme Court and other courts have upheld ballot access restrictions identical or similar to those challenged here.

### 1.  The Disaffiliation Provision

In Storer, the Supreme Court upheld a California statute that denied ballot positions to independent candidates who had voted in the immediately preceding party primary elections or had registered as a party member at any time during the year preceding the primary election. Storer, 414 U.S. at 728. Two of the plaintiffs were registered Democrats, one until January and the other until March, 1972. Id. This party affiliation disqualified them from being listed on the ballot as independent candidates for the United States Congress. Id. They challenged the constitutionality of the statute, claiming (like Owens) that it infringed their rights under the First and Fourteenth Amendments to the Constitution. Id. at 727.

The Supreme Court held that it had "no hesitation" in upholding the validity of California's disaffiliation provisions. Id. at 733. In relevant part, the Court found that the

"requirement that the independent candidate not have been affiliated with a political party for a year before the primary [was] expressive of a general state policy aimed at maintaining the integrity of the various routes to the ballot." Id. In addition, because California law imposed a similar one-year disaffiliation requirement on political party candidates, the statute did not impermissibly discriminate against prospective independent candidates. Id. at 733-34. Merely that the statute required candidates desiring "to run for office as an independent [to] anticipate [their] candidacy substantially in advance of [the] election [i.e., a year]," did not impose any unconstitutional burden on the prospective candidates' voting or associational rights. Id. at 734. Rather, the Supreme Court found that the prospective candidate was simply required to exercise "foresight" in planning his or her candidacy. Id. This requirement, in turn, "protects the direct primary process by refusing to recognize independent candidates who do not make early plans to leave a party and take the alternative route to the ballot" and "works against independent candidates prompted by short-range political goals, pique, or personal quarrel." Id. at 735. It also presents a "substantial barrier to a party fielding an 'independent' candidate to capture and bleed off votes in the general election that might well go to another party." Id. Given these various considerations, the Supreme Court held:

> It appears obvious to us that the one-year disaffiliation provision furthers the State's interest in the stability of its political system. We also consider that interest as not only permissible, but compelling and as <u>outweighing the interest the candidate and his supporters may have in making a late rather than an early decision to seek independent ballot status.</u>

Id. at 736 (emphasis added). See also Lippitt v. Cipollone, 404 U.S. 1032, 1032 (1972) (upholding statute banning party-primary candidacies of those who had voted in another party's primary within last four years); Thournir v. Meyer, 909 F.2d 408, 410 (10th Cir. 1990) (upholding Colorado's one-year independent candidate disaffiliation provision).

Relying largely on the Supreme Court's decision in Storer, the Supreme Judicial Court ("SJC") previously rejected a similar challenge to the constitutionality of G.L. c. 53, §§ 6 and 37 brought by an individual, Metros, who wished to be listed on the November 1984 ballot as an independent candidate for State Senator. Metros, 484 N.E.2d at 1017, 396 Mass. at 158. Like Owens, Metros was an unenrolled registered voter who chose to vote in the March 13, 1984 Democratic Party presidential primary election. Id. The next day, Metros (presumably, like Owens) changed her enrollment from Democrat to unenrolled. Id. Seventy-seven days after the primary, Metros filed nomination papers as an unenrolled candidate for the office of State Senator. Id. Metros claimed that she "met all the qualifications to have her name printed on the ballot, except for the requirement that she obtain from the [city] registrars of voters a certificate that she was not enrolled as a member of any political party during the preceding ninety days." Id. The registrars (like the election officials here) determined that they were "prohibited by statute from issuing the certificate because of Metros' enrollment in the Democratic party" on the day she voted in that party's presidential primary. Id. at 1018, 158. Metros filed suit.

Like Owens, Metros claimed that the election officials' enforcement of the Commonwealth's disaffiliation provisions violated her federal and state constitutional rights of association and equal protection. Id. at 1020-21, 163. The SJC held that Metros' federal constitutional claims were fully disposed of by the Supreme Court's decision in Storer, and that no different conclusion was required under the State Constitution. Id. at 1020-21, 163. In addition, like Owens, Metros contended that the Commonwealth's closed primary system[6] impermissibly infringed on her right to vote in presidential primary elections because it forced

---

[6] A "closed" primary limits voting in a party's primary to members of that political party. An "open" primary permits non-party members to take another political party's primary ballot. Massachusetts conducts closed primaries although, as discussed below, its election laws permit on-the-spot enrollment and unenrollment at primary elections. Metros, 484 N.E.2d at 1021, 396 Mass. at 164 n. 9 (internal citation omitted).

her to declare an affiliation with a political party and thereby relinquish – albeit temporarily – her status as an unenrolled voter. See id. at 1021, 164. The SJC rejected this claim, holding that neither the State nor Federal Constitution prohibits a state from restricting access to primary election ballots to members of the political party whose candidates are seeking the nomination. Metros, 484 N.E.2d at 1020-21, 396 Mass. at 164-65 (citing Rodriguez v. Popular Democratic Party, 457 U.S. 1, 14 (1982)). Indeed, the Supreme Court recently reaffirmed that political parties have a First Amendment associational right to <u>restrict</u> participation in their primaries to persons who bear some real and substantial allegiance to their party. California Democratic Party v. Jones, 530 U.S. 567, 575 (2000) ("In no area is the political association's right to exclude more important than in the process of selecting its nominee."); see also Tashjian v. Republican Party of Conn., 479 U.S. 208, 215-16, n.6 (1986) (a "nonmember's desire to participate in [a political] party's affairs is overborne by the countervailing and legitimate right of the party to determine its own membership qualifications").

In Jones, the Supreme Court struck down California's so-called "blanket" primary system that allowed "all persons entitled to vote, including those not affiliated with any political party, . . . the right to vote for any candidate regardless of the candidate's political affiliation." Jones, 530 U.S. at 570. In so doing, the Supreme Court distinguished a closed primary system, like that at issue here, by observing that "[u]nder that system, <u>even when it is made quite easy for a voter to change his party affiliation on the day of the primary</u>, and thus, in some sense, to 'cross over,' <u>at least he must formally become a member of the party; and once he does so, he is limited to voting for candidates of that party</u>." Id. at 577 (emphasis added). From this reasoning, it follows that a voter may be constitutionally required to choose, as G.L. c. 53, § 37 requires, between participating in a political party's closed presidential primary election and preserving his or her continuous status as an unenrolled voter. Metros, 484 N.E.2d 1021, 396

12

Mass. at 164. This is precisely the conclusion that Judge Stearns reached in his recent decision in McClure. McClure, No. 04-10826, slip op. at 6 (discussing the state's legitimate interest in preserving the "partisan integrity of the parties' nominating processes"). As the SJC stated in words equally applicable here: "[Owens] chose to join the Democratic party. A benefit of that choice was [his] opportunity to participate in the nominating process of the party. A burden of that choice was [his] disqualification from seeking office as a candidate unaffiliated with that party." Metros, 484 N.E.2d 1021, 396 Mass. at 164. Owens simply cannot have the "benefits of being an independent and a Democrat at the same time." Id.

Furthermore, contrary to Owens' bare allegation, requiring prospective unenrolled candidates to remain unaffiliated with any political party for 90 days prior to the applicable filing deadline imposes no greater restriction on unenrolled candidates than the restrictions imposed on political party candidates. Opinion of the Justices, 333 N.E.2d, 380, 382, 368 Mass. 819, 823 (Mass. 1975) (holding that "the restrictions on independents contained in [the proposed version of G.L. c. 53, § 6] are no greater than those imposed on members of political parties"). G.L. c. 53, § 48 requires persons seeking to run in a political party's primary to obtain a certificate from the local registrar, "certifying that he [or she] has been enrolled as a member of the political party whose nomination he seeks throughout the ninety days prior to the last day . . . for filing nomination papers with the state secretary."[7] This requirement precisely mirrors the burden imposed on unenrolled candidates under G.L. c. 53, § 6.

Thus, as in Storer, Metros, and McClure, application of the 90-day disaffiliation provision does not unconstitutionally discriminate against prospective unenrolled candidates

---

[7] In addition, G.L. c. 53, § 48 provides that no certificate for a political party primary "shall be issued to any person who is a candidate for nomination [for State Representative], if such person has been an enrolled member of another political party during the year prior" to the filing deadline. This one-year limitation on cross-party registration is, of course, a more onerous restriction on political party candidates than the 90-day restriction applicable to unenrolled candidates.

13

like Owens. See Storer, 415 U.S. at 733-34. Rather, the disaffiliation provisions contained in G.L. c. 53, § 6 and § 48 merely ensure that all prospective candidates exercise "foresight" in anticipating their election campaigns. Id. at 734. While such provisions may "reduce the universe of potential candidates who may appear on the ballot" by ruling out unenrolled candidacies by individuals who have declared an affiliation with another political party or designation within 90 days preceding the filing deadline, the Supreme Court has repeatedly recognized that such restrictions are in keeping with a State's legitimate "interest in protecting the integrity, fairness, and efficiency of [its] ballots and election process as a means for electing public officials." Timmons, 520 U.S. at 363-64; Storer, 415 U.S. at 733-36.

### 2. The Signature Provision

Owens' inability to obtain a Voter Registration Certificate is alone sufficient to render him ineligible for listing on the November ballot as an unenrolled candidate. See Johnson v. State Ballot Law Commission, 287 N.E.2d 597, 598, 362 Mass.480, 482-83 (Mass. 1972) (filing of voter registration certificate is mandatory). The Court, therefore, need not and should not address Owens' challenge to the Secretary's enforcement of the signature provision. See Burton v. United States, 196 U.S. 283, 295 (1905) (court should address constitutional issue only where necessary to decision). The Secretary addresses this alternative basis for his decision only in the interests of providing the Court with a complete record.

The Supreme Court has repeatedly recognized that "States may condition access to the general election ballot by a minor party or independent candidate upon a showing of a modicum of support among the potential voters for the office." Munro, 479 U.S. at 193. Indeed, the Court has expressly upheld signature requirements substantially more burdensome that the 150 certified signatures required here. See, e.g., American Party v. White, 415 U.S. 767 (1974) (upholding statute requiring minor parties to obtain approximately 400 signatures per day within

a 55-day period); Jenness v. Forston, 403 U.S. 431 (1971) (upholding statute requiring independent candidates and minor party candidates to file nominating petition signed at least 5% of the voters eligible to vote in the last election for the office sought within a 180-day period). Here, Owens does not directly challenge the number of certified signatures required by Massachusetts law – only the manner in which those signatures are collected and counted.[8]

The regulatory burden imposed by the challenged nominating form requirements on prospective unenrolled candidates, like Owens, seeking ballot listing is slight. See Timmons, 520 U.S. at 358 (where the burden imposed on a candidate's associational rights is not "severe," a "State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions") (internal quotation marks omitted). All the prospective candidate need do is adhere to the requirements specified in G.L. c. 53, § 8 and to the instructions printed on the face of the nominating form itself. The Supreme Court has long recognized that limiting ballot access to those candidates who have "complied with state election law requirements is the prototypical example of a regulation that, while it affects the right to vote, is eminently reasonable." Id. at 359 (quoting Burdick v. Takushi, 504 U.S. 428, 440 (1992)).

Here, Massachusetts law requires all candidates to disclose on the nominating form – and before any signatures are collected – the candidate's city or town of residence and the political designation or affiliation that he purports to represent. G.L. c. 53, §§ 8, 45. These minimal regulatory burdens are readily justified by the Commonwealth's undoubted "interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials." Id. at 364; see also Anderson, 460 U.S. at 788 n.9 (noting that

---

[8]To the extent Owens is challenging the Secretary's interpretation and enforcement of G.L. c. 53, § 8 or any other state law (as opposed to any alleged federal constitutional violation), his complaint is barred by the Eleventh Amendment. Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 106 (1984) (discussed below).

"generally applicable and evenhanded restrictions" on ballot access ordinarily are upheld). Massachusetts appellate courts in fact have expressly held that the requirements for including the candidate's city and town and political affiliation are not "mere technicalit[ies]," but rather are a means of ensuring the integrity of the nominating process and avoiding potential voter confusion. See Sholley v. Secretary of Commonwealth, 794 N.E.2d 654, 657, 59 Mass. App. Ct. 121, 125 (2003) (holding that Secretary properly rejected prospective candidate's nomination papers where candidate failed to list his city or town of residence on nomination form, even though candidate provided the street and number of his home); Garrison v. Merced, 596 N.E.2d 404, 405, 33 Mass. App. Ct. 116, 117 (1992) (under the comparable requirement imposed on political party candidates under G.L. c. 53, § 45, holding that failure of a political party candidate to include on his nomination papers the name of the "political party whose nomination he seeks" was not a "mere technicality").

The requirement for listing of a candidate's full residence address on nomination forms, for instance, is intended to enable subscribers to readily identify where the prospective candidate resides so that eligible voters are not confused as to whom they are being asked to nominate. Sholley, 794 N.E.2d at 657, 59 Mass. App. Ct. at 125. Merely including a street address and zip code does not satisfy this goal. Absent some direct or clearly recognizable reference to the candidate's city or town, a street address and zip code are not likely to be readily identifiable to the average subscriber and, thus, the potential for voter confusion about a candidate's residence still exists. See id. (upholding Secretary's rejection of nomination papers that failed to include political party candidate's town of residence, but reversing Secretary's rejection of another candidate's nomination papers that included a readily identifiable abbreviation of town together with street address and zip code that, taken together, were sufficient to avoid voter confusion as

to candidate's residence). Strict adherence to G.L. c. 53, § 8's requirements and the nominating form's instructions reduces to a bare minimum this risk of potential voter confusion.[9]

The requirement for listing a candidate's political designation likewise is intended to prevent subscribers from being misled as to a candidate's professed political affiliation or identification. See Garrison, 596 N.E.2d at 405, 33 Mass. App. Ct. at 117. This concern is heightened where, as here, a prospective candidate elects to identify his political designation as "independent" only on some but not all of his nomination papers. See Compl. at Exhibits 1-11. Owens acknowledges that he left the political designation section of 4 nominating sheets (containing 21 certified voter signatures) blank. While Owen correctly notes that the Secretary's election guide states that "if you place no political designation on your papers, the designation 'unenrolled' will appear on the ballot," see id. at Exhibit 12, application of that general rule here would result in only 21 certified voter signatures nominating Owens as an "unenrolled" candidate for State Representative – far less than the 150 certified signatures required by statute. G.L. c. 53, § 6. The record also establishes that Owens did not submit the required number of certified voter signatures to support a nomination under his self-described political designation "independent." See Compl. at Exhibits 4-11. Out of the total 214 certified voter signatures that Owens submitted, 79 signatures[10] were ineligible because (as noted above) Owens failed to declare on the nominating forms his city of residence. See Compl. at ¶ 11 and Exhibits 4-11; Tassinari Aff. at ¶¶ 5-8. Owens therefore submitted only 135 certified voter signatures (15 short

---

[9]Significantly, the Commonwealth need not present any "elaborate, empirical verification of the weightiness of [its] asserted justifications." Timmons, 520 U.S. at 364. This is because the Supreme Court has recognized that states are permitted to respond to "potential deficiencies in the electoral process with foresight rather than reactively. . . ." Munro, 479 U.S. at 195.

[10]This figure includes the 4 certified voter signatures on the nominating sheet that violated both the political designation and residence requirements. See Compl. at Exhibit 4; Tassinari Aff. at ¶¶ 6-8.

17

of the minimum number required by law) to support his nomination as a self-described "independent" candidate for State Representative. See id.

Furthermore, by casting the residence and political designation requirements in mandatory terms, see G.L. c. 53, § 8 ("[a]ll . . . nomination papers shall . . . specify. . ."), the Massachusetts Legislature clearly intended to leave "no room for discretion to election officials in order to minimize controversy and provide clear guidelines for the [election] process." Garrison, 596 N.E.2d at 405, 33 Mass. App. Ct. at 118. Recognition of individual exceptions to G.L. c. 53, § 8's generally applicable nomination requirements, therefore, would itself undermine the Commonwealth's legitimate interests in ensuring the uniform administration and enforcement of its election laws. See id.

### C. Owens' State Law Claims Are Barred By The Eleventh Amendment

Although the focus of Owens' complaint is a constitutional challenge to the Secretary's denial of his request for placement on the ballot, he also makes passing reference to certain state law tort claims, i.e., fraud, intentional infliction of emotional distress and negligent infliction of emotional distress, for which he presumably seeks an award of money damages. See Complaint at ¶ 15 and Prayer for Relief at ¶ 5. Assuming these claims meet the minimal pleading requirements of Fed. R. Civ. P. 8(a) – an issue that the Secretary seriously doubts – Owens nevertheless fails to establish a likelihood of success on the merits.

Where, as here, a complaint alleges that a state official, like the Secretary, "violated state law in carrying out [his] official responsibilities," the claim is barred by the Eleventh Amendment, "regardless of whether it seeks damages or injunctive relief." Pennhurst, 465 U.S. at 102, 121. As the Supreme Court in Pennhurst explained:

> A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform

their conduct to state law. Such a result conflicts directly with the principles of federalism that underly the Eleventh Amendment.

Id. at 106 (emphasis added). See also Papasan v. Allain, 478 U.S. 265, 277 (1986) (same). Accordingly, Owens fails to demonstrate a likelihood of success on any alleged state law claims because the Eleventh Amendment shields the Secretary from being sued in federal court on such claims, absent the Commonwealth's express consent. See id.

Owens may contend that the Commonwealth, in enacting the Massachusetts Tort Claims Act, G.L. c. 258, § 1 et seq. ("the MTCA"), consented to being sued for certain types of common law tort claims. That contention, however, is only partially correct. The MTCA, by its terms, waived the Commonwealth's sovereign immunity only with respect to actions properly commenced in state courts. Irwin v. Commissioner of Dep't of Youth Servs., 448 N.E.2d 721, 727, 388 Mass. 810, 819 (1983) (holding that the MTCA only waives sovereign immunity for a claim brought in state courts); see also Pennhurst, 465 U.S. at 99, n.9 ("the Court consistently has held that a State's waiver of sovereign immunity in its own courts is not a waiver of the Eleventh Amendment immunity in the federal courts"). The MTCA did not waive the Commonwealth's sovereign immunity under the Eleventh Amendment for actions commenced in federal courts. Caisse v. DuBois, 346 F.3d 213, 218 (1st Cir. 2003) ("By enacting the [MTCA], the Commonwealth has not waived its Eleventh Amendment immunity to suit in federal court.") (citing Rivera v. Massachusetts, 16 F. Supp. 2d 84, 87-88 (D. Mass. 1998)).

Moreover, even with respect to actions properly commenced in a state court, the Commonwealth has not waived sovereign immunity for intentional tort claims of the sort alleged here. See G.L. c. 258, § 10(c) ("The provisions of the [MTCA] shall not apply to . . . any claim arising out of an intentional tort, including . . . intentional mental distress, malicious prosecution, malicious abuse of process, libel, slander, misrepresentation, deceit, invasion of privacy, interference with advantageous relations or interference with contractual relations. . .

19

."). And, with respect to any non-intentional torts, such as any purported negligence claims, individual public employees are not liable "for any injury or loss of property . . . caused by [their] negligent or wrongful act or omission while acting within the scope of [their] office or employment." G.L. c. 258, § 2. The exclusive remedy for such a loss or injury is a suit against the relevant "public employer," not the individual public employee. Id.; see Breault v. Chairman of Bd. of Fire Comm'rs, 513 N.E.2d 1277, 1283 (Mass. 1987) (the MTCA "absolved public employees from liability for their negligent acts performed within the scope of official duties"), cert. denied, 485 U.S. 906 (1988). Furthermore, a statutory prerequisite to any such claim against a public employer, like the Commonwealth, is presentment of the claim in "strict compliance" with the requirements of G.L. c 258, § 4. See Richardson v. Dailey, 675 N.E.2d 787, 789, 424 Mass. 258, 261 (1997) (discussing the mandatory presentment requirement under the MTCA). Owens does not allege that he has fulfilled this statutory prerequisite.

### III. CONCLUSION

For all of the foregoing reasons, plaintiff's motion for a preliminary injunction should be denied and the complaint dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

> Respectfully submitted,
>
> WILLIAM FRANCIS GALVIN,
> SECRETARY OF THE COMMONWEALTH,
> By his counsel,
>
> THOMAS F. REILLY
> ATTORNEY GENERAL
>
> _/s/ James J. Arguin_
> James J. Arguin (BBO No. 557350)
> Assistant Attorney General
> One Ashburton Place, Room 2019
> Government Bureau
> Boston, Massachusetts 02108-1698
> (617) 727-2200, ext. 2074

Dated: June 10, 2004

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail-hand on 6-10-04