UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


ROY OWENS                                  CIVIL ACTION
    Plaintiff

                                    NO.___04-11149-DPW___

        V.

William Francis Galvin, Secretary of the Commonwealth;Election Division,
John Donovan, Chairman of the Board of Election Commission,
City of Boston, Board of Election commission,City of Boston and et al.,

        Defendant

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO THE DEFENDANT'S MOTION TO DISMISS

Now Come the Plaintiff in the above matter requesting this Honorable   Court to allow Plaintiff's Memorandum of

Law In Opposition to the Defendant's Motion to Dismiss.    Because the Plaintiff has acted in a profession manor in

collecting signatures,  where the district was being change, due to Court order redistricting.  Plaintiff had to quickly

collect the signatures in the dark of the night as Plaintiff worked days,  Many of the signature was bad because of the

Court order redistricting. Plaintiff had his name, address and a clearly identifiable reference to the the city or Town.

this being the zip code which clearly identify as the only  area  whith this zip code.

Because of the "Absent of bad faith or fraud, pre-election irregularities are cured by the voter of the people" .

(See A-8 pg. 1-4).

The defendant has set up a duel electoral system which clearly  is a violation of the 14th Amendment, Federal

Constitution Article 1 and 2  and Massachusetts Article 1, 2, and violation of Mass. Cons. Article I, IX and XVI.

Violate Brown V. Board Education of Topeka, Kansas, 1954  Separate, but not equal doctrine.(See Exhibit A-5

Also this is a violation of  the 14 th  Amendment of equal protection of the Law. (See Ex A-4) Violation of Article 1 of

the Constitution of Massachusetts,equality and happiness, (See Exhibit A-1) Article IX  having an equal right to

election (See Exhibit A-2) and Article XVI ("The fiberty of the press is essential to the security of freedom in a state: it

ought not therefore, to be restrained in this commonwealth.") where candidate turn out more press than any other

body.

Under Mass. R. C. P. 8. All that is necessary is that the defendants be put on notice of theory of plaintiff's case. See Penderson v. Times, Inc. (1989) 404 Mass 14, 532 NE2d 1211, 16 Media L R 1382.And see Nader v. Citron (1977) 372 Mass 96, 360 NE2d 870. And Whitinsville Plaza, Inc. v. Kotseas (1979, Mass) 1979 Adv Sheets 1262, 390 NE2d 243.

The conclusion Rule 12 (b) (6) Provides that no Matter how likely it may seem that pleader will be able to prove case he/she is entitle upon averring claim, to be given and opportunity to prove his/her case and complaint is not subject to dismissal. See Pointer v. American Oil Co. (1968, SD Ind) 295 F Supp. 573. And unless it appears to certainty that the Plaintiffs is entitle to no relief on stated facts which would be proved, complaint must be sustained. Also see United States v. Cattaraugus County (1946, DC NY) 67 F Supp. 294. For these reasons and Rule of Law, the Plaintiffs complaint must be sustained in Opposition to the Defendant's Motion to Dismiss.



SIGN UNDER THE PAINS PENALTIES OF PERJURY

1/6 DAY OF June 2004

ROY OWENS, Pro se
6 WOODVILLE ST.
ROXBURY, MA 02119
Tel- 541-4335

RECEIVED BY_____
SERVED BY_____

CC:
Att: James J. Arguin (BBO) No. 557350
Assistant attorney General
One Ashburton Place, Room 2009
Government bureau
Boston, Massachusetts 02108-1698
(617) 727-2200, 310.04777750.. 2074

and were served by hand to the ( PRO SE CLERK OF COURT- CIVIL ACTION / UNITED STATES DISTRICT COURT  CLERK'S OFFICE/  SUITE 2300 / UNITED STATES COURTHOUSE / 1 COURTHOUSE WAY / BOSTON, MASSACHUSETTS 02210. TELEPHONE 3 617-748-9152.

Exhibit A

# CONSTITUTION OF THE COMMONWEALTH OF MASSACHUSETTS.



### PREAMBLE.

The end of the institution, maintenance, and administration of government, is to secure the existence of the body politic, to protect it, and to furnish the individuals who compose it with the power of enjoying in safety and tranquillity their natural rights, and the blessings of life: and whenever these great objects are not obtained, the people have a right to alter the government, and to take measures necessary for their safety, prosperity and happiness.

The body politic is formed by a voluntary association of individuals: it is a social compact, by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for the common good. It is the duty of the people, therefore, in framing a constitution of government, to provide for an equitable mode of making laws, as well as for an impartial interpretation, and a faithful execution of them; that every man may, at all times, find his security in them.

We, therefore, the people of Massachusetts, acknowledging, with grateful hearts, the goodness of the great Legislator of the universe, in affording us, in the course of His providence, an opportunity, deliberately and peaceably, without fraud, violence or surprise, of entering into an original, explicit, and solemn compact with each other; and of forming a new constitution of civil government, for ourselves and posterity; and devoutly imploring His direction in so interesting a design, do agree upon, ordain and establish the following *Declaration of Rights, and Frame of Government,* as the **Constitution of the Commonwealth of Massachusetts.**

## PART THE FIRST
### *A Declaration of the Rights of the Inhabitants*
#### *of the Commonwealth of Massachusetts.*

Article I. All men are born free and equal, and have certain natural, essential, and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing, and protecting property; in fine, that of seeking and obtaining their safety and happiness. [Annulled by Amendments, Art. CVI]

Article II. It is the right as well as the duty of all men in society, publicly, and at stated seasons to worship the Supreme Being, the great Creator and Preserver of the universe. And no subject shall be hurt, molested, or restrained, in his person, liberty, or estate, for worshipping God in the manner and season most agreeable to the dictates of his own conscience; or for his religious profession or



Article VII. Government is instituted for the common good; for the protection, safety, prosperity and happiness of the people; and not for the profit, honor, or private interest of any one man, family, or class of men: Therefore the people alone have an incontestable, unalienable, and indefeasible right to institute government; and to reform, alter, or totally change the same, when their protection, safety, prosperity and happiness require it.

Article VIII. In order to prevent those, who are vested with authority, from becoming oppressors, the people have a right, at such periods and in such manner as they shall establish by their frame of government, to cause their public officers to return to private life; and to fill up vacant places by certain and regular elections and appointments.

Article IX. All elections ought to be free; and all the inhabitants of this commonwealth, having such qualifications as they shall establish by their frame of government, have an equal right to elect officers, and to be elected, for public employments. [See Amendments, Arts. XL V and XLVIII, The Initiative, sec. 2.] [For compulsory voting, see Amendments, Art. LXI.] [For use of voting machines at elections, see Amendments, Art. XXXVIII.] [For absent voting, see Amendments, Art. LXXVI.]

Article X. Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws. He is obliged, consequently, to contribute his share to the expense of this protection; to give his personal service, or an equivalent, when necessary: but no part of the property of any individual can, with justice, be taken from him, or applied to public uses, without his own consent, or that of the representative body of the people. In fine, the people of this commonwealth are not controllable by any other laws than those to which their constitutional representative body have given their consent. And whenever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor. [See Amendments, Arts. ........, ......, ......., ......., The Initiative, II, sec. 2, XLIX, L, LT and XCVII.]

Article XI. Every subject of the commonwealth ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property, or character. He ought to obtain right and justice freely, and without being obliged to purchase it; completely, and without any denial; promptly, and without delay; conformably to the laws.

Article XII. No subject shall be held to answer for any crimes or offence, until the same is fully and plainly, substantially and formally, described to him; or be compelled to accuse, or furnish evidence against himself. And every subject shall have a right to produce all proofs, that may be favorable to him; to meet the witnesses against him face to face, and to be fully heard in his defence by himself, or his counsel, at his election. And no subject shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, or privileges, put out of the protection of the law, exiled, or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land.

And the legislature shall not make any law, that shall subject any person to a capital or infamous punishment, excepting for the government of the army and navy, without trial by jury. [See Amendments, Art. XLVIII, The Initiative, II, sec. 2.]

Article XIII. In criminal prosecutions, the verification of facts in the vicinity where they happen, is one of the greatest securities of the life, liberty, and property of the citizen.

Article XIV. Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions. All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order in the warrant to a civil officer, to make search in suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure: and no warrant ought to be issued but in cases, and with the formalities prescribed by the laws. [See Amendments, Art. X LVIII, The Initiative, II, sec. 2.]

Article XV. In all controversies concerning property, and in all suits between two or more persons, except in cases in which it has heretofore been otherways used and practiced, the parties have a right to a trial by jury; and this method of procedure shall be held sacred, unless, in causes arising on the high seas, and such as relate to mariners' wages, the legislature shall hereafter find it necessary to alter it. [See Amendments, Art. XLVIII, The Initiative, II, sec. 2.]

Article XVI. [The liberty of the press is essential to the security of freedom in a state: it ought not, therefore, to be restrained in this commonwealth.] [See Amendments, Art. XLVIII, The Initiative, II, sec. 2.] [Annulled and superseded by Amendments, Art. LXXVII.

Article XVII. The people have a right to keep and to bear arms for the common defence. And as, in time of peace, armies are dangerous to liberty, they ought not to be maintained without the consent of the legislature; and the military power shall always be held in an exact subordination to the civil authority, and be governed by it.

Article XVIII. A frequent recurrence to the fundamental principles of the constitution, and a constant adherence to those of piety, justice, moderation, temperance, 12 industry, and frugality, are absolutely necessary to preserve the advantages of liberty, and to maintain a free government. The people ought, consequently, to have a particular attention to all those principles, in the choice of their officers and representatives: and they have a right to require of their lawgivers and magistrates, an exact and constant observance of them, in the formation and execution of the laws necessary for the good administration of the commonwealth.

Article XIX. The people have a right, in an orderly and peaceable manner, to assemble to consult upon the common good; give instructions to their representatives, and to request of the legislative body, by the way of addresses, petitions, or remonstrances, redress of the wrongs done them, and of the grievances they suffer. [See Amendments, Art. XLVIII, The Initiative, II, sec. 2.]

Article XX. The power of suspending the laws, or the execution of the laws, ought never to be exercised but by the legislature, or by authority derived from it, to be exercised in such particular cases only as the legislature shall expressly provide for. [See Amendments, Arts. XLVIII, Definition and LXXXIX]

Article XXI. The freedom of deliberation, speech and debate, in either house of the legislature, is so essential to the rights of the people, that it cannot be the foundation of any accusation or prosecution, action or complaint, in any other court or place whatsoever. [See Amendments, Art. , The Initiative, II, sec. 2.]

Article XXII. The legislature ought frequently to assemble for the redress of grievances, for

The Constitution of the United States of America

Other Areas of Discrimination................................. 1859
    Transportation........................................... 1859
    Public Facilities........................................ 1859
    Marriage................................................. 1860
    Judicial System.......................................... 1860
    Public Designation....................................... 1861
    Public Accommodations.................................... 1861
    Elections................................................ 1861
Permissible Remedial Utilization of Racial Classifications    1861
The New Equal Protection...................................... 1869
Classifications Meriting Close Scrutiny....................... 1869
    Alienage and Nationality................................. 1869
    Sex...................................................... 1875

[[Page 1563]]

    Illegitimacy............................................. 1886
Fundamental Interests: The Political Process.............. 1892
    Voter Qualifications..................................... 1893
    Access to the Ballot..................................... 1897
    Apportionment and Districting............................ 1902
    Weighing of Votes........................................ 1911
The Right to Travel........................................... 1911
    Durational Residency Requirements........................ 1911
Marriage and Familial Relations............................... 1914
Poverty and Fundamental Interests: The Intersection of Due
    Process and Equal Protection............................. 1916
    Generally................................................ 1916
    Criminal Procedure....................................... 1918
    The Criminal Sentence.................................... 1920
    Voting................................................... 1921
    Access to Courts......................................... 1922
    Educational Opportunity.................................. 1923
    Abortion................................................. 1925
Section 2. Apportionment of Representation.................... 1926
Sections 3 and 4. Disqualification and Public Debt............ 1928
Section 5. Enforcement........................................ 1928
Generally..................................................... 1928
State Action.................................................. 1929
Congressional Definition of Fourteenth Amendment Rights...    1933

[[Page 1565]]

FOURTEENTH AMENDMENT

SECTION 1. RIGHTS GUARANTEED


    Section 1. All persons born or naturalized in the United States, and
subject to the jurisdiction thereof, are citizens of the United States
and the State wherein they reside. No State shall make or enforce any
law which shall abridge the privileges or immunities of citizens of the
United States; nor shall any State deprive any person of life, liberty,
or property, without due process of law; nor deny to any person within
its jurisdiction the equal protection of the laws.


FOURTEENTH AMENDMENT

SECTION 1. RIGHTS GUARANTEED:
CITIZENS OF THE UNITED STATES

Exhibit A-5

# Brown v. Board of Education of Topeka, Kansas, 1954

74 Supreme Court Reporter, p. 686-693

**347 U.S. 483 BROWN ET AL. V. BOARD OF EDUCATION OF TOPEKA, SHAWNEE COUNTY, KAN., ET AL.**
**BRIGGS ET AL. V. ELLOITT ET AL.**
**DAVIS ET AL. V. COUNTY SCHOOL BOARD OF PRINCE EDWARD COUNTY, VA., ET AL.**
**GEBHART ET AL. V. BELTON ET AL.**

**Reargued Dec. 7, 8, 9, 1953.**
**Decided May 17, 1954.**

**No. 10:**

Mr. Chief Justice Warren delivered the opinion of the Court.

These cases come to us from the States of Kansas, South Carolina, Virginia, and Delaware. They are premised on different facts and different local conditions, but a common legal question justifies their consideration together in this consolidated opinion.

In each of the cases, minors of the Negro race, through their legal representatives, seek the aid of the courts in obtaining admission to the public schools of their community on a nonsegregated basis. In each instance, they have been denied admission to schools attended by white children under laws requiring or permitting segregation according to race. This segregation was alleged to deprive the plaintiffs of the equal protection of the laws under the Fourteenth Amendment. In each of the cases other than the Delaware case, a three-judge federal district court denied relief to the plaintiffs on the so-called "separate but equal" doctrine announced by this Court in Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256. Under that doctrine, equality of treatment is accorded when the races are provided substantially equal facilities, even though these facilities be separate. In the Delaware case, the Supreme Court of Delaware adhered to that doctrine, but ordered that the plaintiffs be admitted to the white schools because of their superiority to the Negro schools.

The plaintiffs contend that segregated public schools are not "equal" and cannot be made "equal," and that hence they are deprived of the equal protection of the laws. Because of the obvious importance of the question presented, the Court took jurisdiction. Argument was heard in the 1952 Term, and reargument was heard this Term on certain questions propounded by the Court.

Reargument was largely devoted to the circumstances surrounding the adoption of the Fourteenth Amendment in 1868. It covered exhaustively consideration of the Amendment in Congress, ratification by the states, then existing practices in racial segregation, and the views of proponents and opponents of the Amendment. This discussion and our own investigation convince us that, although these sources cast some light, it is not enough to resolve the problem with which we are faced. At best, they are inconclusive. The most avid proponents of the post-War Amendments undoubtedly intended them to remove all legal distinctions among "all persons born or naturalized in the United States." Their opponents, just as certainly, were antagonistic to both the letter and the spirit of the Amendments and wished them to have the most limited effect. What others in Congress and the state

legislatures had in mind cannot be determined with and degree of certainty.

An additional reason for the inconclusive nature of the Amendment's history, with respect to segregated schools, is the status of public education at that time. In the South, the movement toward free common schools, supported by general taxation, had not yet taken hold. Education of white children was largely in the hands of private groups. Education of Negroes was almost nonexistent, and practically all of the race were illiterate. In fact, any education of Negroes was forbidden by law in some states. Today, in contrast, many Negroes have achieved outstanding success in the arts and sciences as well as in the business and professional world. It is true that public school education at the time of the Amendment had advanced further in the North, but the effect of the Amendment on Northern States was generally ignored in the congressional debates. Even in the North, the conditions of public education did not approximate those existing today. The curriculum was usually rudimentary; ungraded schools were common in rural areas; the school term was but three months a year in many states; and compulsory school attendance was virtually unknown. As a consequence, it is not surprising that there should be so little in the history of the Fourteenth Amendment relating to its intended effect on public education.

In the first cases in this Court construing the Fourteenth Amendment, decided shortly after its adoption, the Court interpreted it as proscribing all state-imposed discriminations against the Negro race. The doctrine of "separate but equal" did not make its appearance in this Court until 1896 in the case of Plessy v. Ferguson, supra, involving not education but transportation. American courts have since labored with the doctrine for over half a century. In this Court, there have been six cases involving the "separate but equal" doctrine in the field of public education. In Cumming v. Board of Education of Richmond County, 175 U.S. 528, 20 S.Ct. 197, 44 L.Ed. 262, and Gong Lum v. Rice, 275 U.S. 78, 48 S.Ct. 91, 72 L.Ed. 172, the validity of the doctrine itself was not challenged. In more recent cases, all on the graduate school level, inequality was found in that specific benefits enjoyed by white students were denied to Negro students of the same educational qualifications. State of Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208; Sipuel v. Board of Regents of University of Oklahoma, 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247; Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114; McLaurin v. Oklahoma State Regents, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149. In none of these cases was it necessary to re-examine the doctrine to grant relief to the Negro plaintiff. And in Sweatt v. Painter, supra, the Court expressly reserved decision on the question whether Plessy v. Ferguson should be held inapplicable to public education.

In the instant cases, that question is directly presented. Here, unlike Sweatt v. Painter, there are findings below that the Negro and white schools involved have been equalized, or are being equalized, with respect to buildings, curricula, qualifications and salaries of teachers, and other "tangible" factors. Our decision, therefore, cannot turn on merely a comparison of these tangible factors in the Negro and white schools involved in each of the cases. We must look instead to the effect of segregation itself on public education.

[1] In approaching this problem, we cannot turn the clock back to 1868 when the Amendment was adopted, or even to 1896 when Plessy v. Ferguson was written. We must consider public education in the light of its full development and its present place in American life throughout the Nation. Only in this way can it be determined if segregation in public schools deprives these plaintiffs of the equal protection of the laws.

[2] Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our

recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.

[3] We come then to the question presented: Does segregation of children in public schools solely on the basis of race, even though the physical facilities and other "tangible" factors may be equal, deprive the children of the minority group of equal educational opportunities? We believe that it does.

In Sweatt v. Painter, supra [339 U.S. 629, 70 S.Ct. 850], in finding that a segregated law school for Negroes could not provide them equal educational opportunities, this Court relied in large part on "those qualities which are incapable of objective measurement but which make for greatness in a law school." In McLaurin v. Oklahoma State Regents, supra [339 U.S. 637, 70 S.Ct. 853], the Court, in requiring that a Negro admitted to a white graduate school be treated like all other students, again resorted to intangible considerations: "* * * his ability to study, to engage in discussions and exchange views with other students, and, in general, to learn his profession." Such considerations apply with added force to children in grade and high schools. To separate them from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone. The effect of this separation on their educational opportunities was well stated by a finding in the Kansas case by a court which nevertheless felt compelled to rule against the Negro plaintiffs:

"Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental] development of Negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system. Whatever may have been the extent of psychological knowledge at the time of Plessy v. Ferguson, this finding is amply supported by modern authority. Any language in Plessy v. Fersugon contrary to this finding is rejected.

[4] We conclude that in the field of public education the doctrine of "separate but equal" has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment. This disposition makes unnecessary any discussion whether such segregation also violates the Due Process Clause of the Fourteenth Amendment.

[5] Because these are class actions, because of the wide applicability of this decision, and because of the great variety of local conditions, the formulation of decrees in these cases presents problems of considerable complexity. On reargument, the consideration of appropriate relief was necessarily subordinated to the primary question

- the constitutionality of segregation in public education. We have now announced that such segregation is a denial of the equal protection of the laws. In order that we may have the full

assistance of the parties in formulating decrees, the cases will be restored to the docket, and the parties are requested to present further argument on Questions 4 and 5 previously propounded by the Court for the reargument this Term. The Attorney General of the United States is again invited to participate. The Attorneys General of the states requiring or permitting segregation in public education will also be permitted to appear as amici curiae upon request to do so by September 15, 1954, and submission of briefs of October 1, 1954.

It is so ordered.

Cases ordered restored to docket for further argument on question of appropriate decrees.

EX A-6 page 1 (1)

1    page 1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VOL. I

PAGES 1 - 87

EXHIBITS NOS. 1 - 30

HEARING OF THE BALLOT LAW COMMISSION

Wednesday
August 7, 1990
Commencing at 10:05 A.M.

MAHANEY REPORTING SERVICES
Tel. (617) 542-4207

009

P-2

```
 1     APPEARANCES:

 2
        William J. Tierney, Chief Justice of the Boston
 3                   Municipal Court - Hearing Officer

 4     Commission Members:

 5     Jovita Fontanez, Chairwoman
        Everette Sheppard, Commissioner
 6     James Killilae, Commissioner
        William Arrigal, Jr., Commissioner
 7
        Others present:
 8
        Mary Barry, Supervisor of Elections
 9     Jack McElligott, Executive Secretary of Elections
        Mary Kelly Pugsley, Attorney - Law Department,
10                   City of Boston
        Deirdre Fahy, Law Clerk with the Chief Judge
11     Robert D. Russo, Attorney for Anthony Crayton
        Maggy Silve, Intern with the Law Department,
12                   City of Boston
        Kevin Byrd, Campaign Manager for Anthony Crayton
13     Michael Baugh, Deputy Campaign Manager for Anthony
                     Crayton
14     Natalie Carithers, Candidate District 7
        Anthony Crayton, Candidate District 7
15     John Foote, Observer
        Althea Garrison, Candidate District 7
16     Roy Owens, Candidate District 7
        John Donovan, Sr., Head Assistant Registrar of
17                   Voters
        John Donovan, Jr., Administrative Assistant
18

19

20

21

22

23

24

25
```

1    today's.  This is my memorandum of law.

2              MS. FONTANEZ:  Fine.

3              THE HEARING OFFICER:  Okay.

4              MR. MC ELLIGOTT:  John J.

5    McElligott, I am Executive Secretary of the City

6    of Boston Election Commission.  I also attend to

7    the hearings of the Boston Ballot Law Commission

8    and I have since July 6, 1976.

9              The Boston Ballot Law Commission

10   has never adopted the State's rules and

11   regulations.  It has always followed the dictates

12   of the State Ballot Law Commission, no matter what

13   they may have been.  And the Boston Election

14   Commission, when it meets as the Board of

15   Registrars, follows the dictates of Chapter 51,

16   Sections 48 and 49 for residency.

17             We have never found it necessary to

18   adopt rules and regulations because of the State

19   statutes and State Ballot Law Commission and the

20   statutes that govern us - I believe it's Chapter

21   449 Acts of 1895 and Chapter 35, 1913, Section 31

22   and the Deary (sic) type cases.  Therefore, we

23   have never adopted rules and regulations.

24             THE HEARING OFFICER:  Specifically,

25   sir, what objections do you wish to raise?

Exhibit A-7

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

NO. 92-P-889

ROY OWENS,
Plaintiff-Appellant,

v.

CITY OF BOSTON ELECTION DEPARTMENT
and
ANTHONY CRAYTON,
Defendants-Appellees.

APPEAL FROM THE MASSACHUSETTS SUPERIOR COURT

(ELIZABETH BOWEN DONOVAN, JUDGE)

BRIEF FOR APPELLANT

Denise M. Leydon
Weston, Patrick,
Willard & Redding
84 State Street
Boston, MA 02109
(617)742-9310

Attorney for Appellant

*P-2*

2

## STATEMENT OF FACTS

On August 5 and August 6, 1991, appellant Roy Owens objected to the inclusion of Anthony Crayton on the ballot as a candidate for Boston City Council for District 7.   Mr. Owens was also a candidate for the City Council seat.   Mr. Owens' objections were based on his contentions, <u>inter alia</u>, that certain nomination papers submitted by Mr. Crayton and certified by the Election Department were invalid and that Mr. Crayton did not reside in the district for the year preceding the election as required by Chapter 605, §6 of the Acts of 1982.

Specifically, Mr. Owens objected that nomination paper #2734, <u>App.</u> 97, was not signed as accepted by Mr. Crayton, as required by G.L. c. 53, §45 and by the terms of the nomination paper itself, and was therefore invalid.   <u>App.</u> 58-61, 118.   A total of 136 valid and certified nomination signatures are required to qualify for candidacy in District 7.   Mr. Crayton had 145 certified signatures, including the nine signatures on #2734.   <u>App.</u> 121.   The invalidity of nomination sheet #2734 would reduce the number of Mr. Crayton's nominating signatures to 134, which was not sufficient to put his name on the ballot.

Mr. Owens also contended that 86 signatures on Mr. Crayton's nomination papers did not include current addresses, as required by G.L. c. 53, §7.   <u>App.</u> 97, lines 9-14, 17; <u>App.</u> 99, lines 2, 6-8, 10, 13-14, 18, 20, 22, 24, 27-28, 32, 37, 45-48, 50; <u>App.</u> 101, lines 13-17, 21-23, 25-26, 29; <u>App.</u> 103, lines 5-8, 12-13, 18, 20-21, 31-32, 36; <u>App.</u> 105, lines 2-3, 6, 9-10, 16, 18-19;

P-3

3

<u>App.</u> 109, lines 4-7, 13-14, 16-19; <u>App.</u> 111, lines 12, 20, 25, 27-31, 35, 37-43, 46, 49-50; <u>see</u> <u>App.</u> 63-70.   Without these signatures, Mr. Crayton would not have met the criteria for inclusion on the ballot.   In addition, Mr. Owens objected that Mr. Crayton signed his own nomination papers as well as those of Ben Haith, another District 7 candidate, in violation of G.L. c. 53, §7.   See <u>App.</u> 111, line 35; and 115, line 17.   Mr. Haith also signed one of Mr. Crayton's nomination papers.   <u>App.</u> 103, line 10. A voter may only vote for one candidate for each available seat. G.L. c. 53, §7.

Mr. Owens filed his objections in a timely manner, on August 5, 1991, and again on August 6, 1991.   August 6, 1991 was the deadline for filing objections to nomination petitions for city offices.   Therefore, according to G.L. c. 53, §9, the hearing for Mr. Owens' objection should have been set for no earlier than the second Monday after the Friday set for filing objections, or August 19, 1991.   Nevertheless, the Boston Ballot Law Commission (Commission) combined Mr. Owens' objections with an objection filed by Althea Garrison, another candidate in District 7, and set the hearing for both objections for August 7, 1991, two days after Mr. Owens' objections were filed.   Although he was not required to do so, Mr. Owens served Mr. Crayton with notice of his objections in hand on August 5, 1991.   <u>App.</u> 82.   The Commission notified Mr. Crayton by certified mail that Mr. Owens' objections would be addressed at the hearing on August 7, 1991, although Mr. Crayton did not receive that notice before the hearing.   <u>App.</u> 82-84.

Exhibit A-8
P-1

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

NO. 92-P-889

ROY OWENS
Plaintiff-Appellant

v.

CITY OF BOSTON ELECTION DEPARTMENT
and
ANTHONY CRAYTON
Defendants-Appellees.

APPEAL FROM THE MASSACHUSETTS SUPERIOR COURT

(ELIZABETH BOWEN DONOVAN, JUDGE)

BRIEF FOR DEFENDANT-APPELLEE
CITY OF BOSTON ELECTION DEPARTMENT

Albert W. Wallis
Corporation Counsel

Mark Sweeney
Assistant Corporation Counsel

Mary Kelley Pugsley
Assistant Corporation Counsel

City of Boston Law Department
Room 615, City Hall
Boston, MA 02201
(617) 635-4034

Attorneys for Defendant-Appellee
City of Boston Election Department

-3-

*Ex. 2. Page 2*

## ARGUMENT

### A.   ABSENT BAD FAITH OR FRAUD, PRE-ELECTION IRREGULARITIES ARE CURED BY THE VOTE OF THE PEOPLE.

Even assuming, <u>arguendo</u>, the validity and
correctness of Owens' various contentions regarding
Crayton's nomination petitions and candidacy, it is
the inescapable fact of this case that Anthony
Crayton was elected to the Boston City Council and
Roy Owens was not.  Crayton defeated Owens by a
majority of the votes in an election process
untainted by the slightest hint of bad faith or fraud.

An unbroken line of cases in this Commonwealth
culminating in a 1983 decision of this Court stands
for the proposition that the will of the people as
expressed by their ballots is paramount in any
election case.  Moreover, in the absence of bad faith
or fraud, any pre-election irregularities are in fact
cured by the vote of the people.  As the record in
this case is devoid of the slightest intimation of
bad faith or fraud, this appeal should be dismissed.

In <u>Blackmer v. Hildreth</u>, 181 Mass 29 (1902), a
disgruntled also-ran sought an order that the
Petersham Selectmen receive him as one of the board
and command the winner of the election, one Dexter,
to refrain from acting as a selectman.  The Court
held that pre-election informalities in the
nomination paper of the winning candidate did not



-4-

invalidate the election and the ballots were not
"tainted" by such irregularities.  In short, the
Supreme Judicial Court held that pre-election
irregularities -- absent fraud -- could not
invalidate the election and the will of the people
who cast the ballots.  Id.

"The people must be presumed to have expressed
their will by their ballots," wrote Chief Justice
Knowlton in Attorney General v. Campbell, 191 Mass.
497, 501 (1906), another case in which the court
disregarded "preliminary requirements and other
technicalities in giving effect to the plainly
expressed will of the people at elections."  191
Mass. at 502.

> We are of opinion that, while the provisions as
> to holding caucuses for the nomination of
> candidates and as to the filing of nomination
> papers are binding upon the officers for whose
> guidance they are intended, they may be
> disregarded in determining the validity of a
> subsequent election, if it plainly appears that
> the will of the majority of the electors is
> fairly expressed by their ballots.  Id.

Referring to Blackmer v. Hildreth, supra, the
Court added:

> In the last of these cases there was a
> failure to comply with the statute in regard
> to the nomination papers, and it was held
> that the irregularities did not invalidate
> the election.  In referring to these
> statutory preliminaries, Mr. Justice Hammond
> said, in the opinion of the court: "But with
> the preparation of the ballot the influence
> of these provisions ends.  If there be
> irregularities like those in this case they
> do not accompany the ballot to taint it in
> the hands of the voter.  This view of the
> statute gives due weight and scope to the

-5-

> provisions in question, and preserves the
> sanctity of the right of suffrage, and its
> free and honest exercise.

<u>Attorney General v. Campbell</u>, 191 Mass at 502.

A more recent case reaffirmed the principal that
pre-election irregularities could not place the
result of an election in doubt.  The Appeals Court
cited both the <u>Blackmer</u> and <u>Campbell</u> cases, <u>supra</u>,
for the proposition that "[p]re-election
irregularities, at least if not the consequence of
actions in bad faith, and not fraudulent or
significantly prejudicial, usually will be
disregarded by a court after an election has been
held."  <u>Brown v. Hanson</u>, 17 Mass.App.Ct. 932 (1983)
(Rescript Opinion).

Here, Owens appeared as one of two candidates for
election to a single district seat on the Boston City
Council.  After due notice and full opportunity to
participate in the electoral process, the electorate
chose Crayton and spurned Owens and at the same time
cleansed the election machinery of any imperfection
which existed prior to the balloting.  <u>Id</u>.

The record in this case is devoid of even the
slightest suggestion that the election process itself
was tainted by bad faith, fraud or significant
prejudice.  Accordingly, the will of the people must
be observed and Anthony Crayton's election as
District 7 Boston City Councillor must be allowed to

Exhibit A-9

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

92-P-889

ROY OWENS

vs.

BOSTON BALLOT LAW COMMISSION & another. [1]

MEMORANDUM AND ORDER UNDER RULE 1:28

The judgment of dismissal is affirmed on the authority of Brown v. Hanson, 17 Mass. App. Ct. 932 (1983).

Judgment affirmed.

By the Court (Dreben, Jacobs, & Greenberg, JJ.),

Clerk

Entered:   January 14, 1993.

---

[1]  Anthony Crayton.

— Exhibit A-10

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

ROY OWENS, pro se, )
Plaintiff )
)
v. )
)
ANTHONY CRAYTON; BOSTON ELECTION )
CHAIRWOMAN, JOVITA FONTANEZ, BOSTON )
ELECTION COMMISSIONERS, EVERETTE )            Civil Action
SHEPPARD, JAMES KILLILAE, WILLIAM )            No.93-10934K
ARRIGAL, JR., BOSTON BALLOT LAW )
COMMISSION CHIEF JUSTICE OF THE BOSTON )
MUNICIPAL, COURT WILLIAM TIERNEY, )
BOSTON ELECTION DEPARTMENT FOR THE CITY )
OF BOSTON MARY BARRY SUPERIOR OF )
ELECTIONS, JOHN DONOVAN, SR., HEAD )
ASSISTANT REGISTRAR OF VOTERS, BOSTON )
BALLOT LAW COMMISSION AND BOSTON )
ELECTION DEPARTMENT, CITY OF BOSTON, )
Defendants )
)

MEMORANDUM OF LAW IN SUPPORT OF MUNICIPAL DEFENDANTS',
BOSTON ELECTION CHAIRWOMAN, JOVITA FONTANEZ,
BOSTON ELECTION COMMISSIONERS, EVERETTE SHEPPARD,
JAMES KILLILAE, WILLIAM ARRIGAL, JR., BOSTON BALLOT LAW
COMMISSION CHIEF JUSTICE OF THE BOSTON MUNICIPAL,
COURT WILLIAM TIERNEY, BOSTON ELECTION DEPARTMENT
FOR THE CITY OF BOSTON MARY BARRY
SUPERIOR OF ELECTIONS, JOHN DONOVAN, SR.,
HEAD ASSISTANT REGISTRAR OF VOTERS, BOSTON BALLOT
LAW COMMISSION AND BOSTON ELECTION DEPARTMENT,
CITY OF BOSTON, MOTION TO DISMISS

I.   STATEMENT OF THE FACTS

The gravaman of this Complaint stems from a decision
of the Boston Ballot Law Commission.

On or before August 6, 1991, plaintiff Owens filed a
variety of objections to the Commission concerning Anthony

Fed-P-2

Commission.  G.L. c.30A, §14 (1) states in pertinent part,
"Proceedings for judicial review of an agency decision
shall be instituted in the superior court for the county
(a) where the plaintiffs or any of them reside or have
their principal place of business within the commonwealth,
or (b) where the agency has its principal office, or (c)
of Suffolk".  Pursuant to G.L. c.30A, §15, the Massachu-
setts Supreme Judicial Court and the Appeals Court have
concurrent jurisdiction to review any proceedings, deter-
minations made, and orders or judgments entered in the
Superior Court pursuant to section fourteen.

        In the instant case, plaintiff Owens is appealing
the Commission's decision to the Federal District Court
claiming that the decision was in violation of his due
process rights; "(T)his is an appeal to the Federal Court
after all other means have been exhaulted".  (See plain-
tiff's complaint, paragraphs 8 & 9)  However, he cannot
appeal the decision of the Commission to this court for
Massachusetts law definitively states that the appeals
process must be instituted in the state superior court.
The plaintiff has exhausted the avenues of appeal available
to him under state law and now cannot ask this court to
overturn the Commission's decision for the Federal District
Court does not have subject matter jurisdiction and, there-
fore, is not the appropriate forum for such a request.

        2. The Rooker Doctrine Squarely Bars Plaintiff's
           Attempt to Appeal the State Court Decisions to this
           Court.

        Plaintiff's complaint is vague, ambiguous and
unclear in its allegations and statements and fails to
clearly set forth the theory of law upon which he is
basing his cause of action.  However, if he is attempting
to appeal the Massachusetts Superior Court, Appeals Court
and/or Supreme Judicial Court decisions declining to